THOMAS SMITH *vs.* NICHOLAS THOMPSON.

*Trespass on a Burial Lot—Punitive Damages.*

An action of trespass *quare clausum fregit* can be maintained for breaking and entering a burial lot; the trespass complained of being the digging a grave in the lot and burying therein the corpse of a child without the consent of the plaintiff, who had acquired the privilege and right to make interments in the lot to the exclusion of others, so long as the ground belonging to a society of which the plaintiff was a member, (in which ground was the lot purchased by the plaintiff,) remained a cemetery; and which right or privilege had not been forfeited or lost at the time the action was brought, though the plaintiff had withdrawn from the society, which was subsequently incorporated by the Act of 1867, ch. 343.

There being evidence before the jury from which they could find that the defendant was actuated by malice in committing the trespass, the plaintiff was entitled to punitive damages.

APPEAL from the Circuit Court for Frederick County.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE, MILLER, ALVEY, and IRVING, J.

*Edward Y. Goldsborough* and *Charles W. Ross,* for the appellant.

*William Ritchie* and *John Ritchie,* for the appellee.

MILLER, J., delivered the opinion of the Court.

This is an action of trespass *quare clausum fregit* brought by the appellee against the appellant for breaking and entering the plaintiff's burial lot, No. 19, in "The Laboring Sons' Cemetery." The trespass complained of is, that the defendant in June, 1879, dug a grave in this lot and buried therein the corpse of a child, without the plaintiff's permission or consent. The facts to be first stated are substantially as follows:

In 1839 an unincorporated voluntary association of colored men was formed under the name of "The Beneficial Society of Laboring Sons of Frederick." In 1851 or 1852, this society purchased a lot of ground in Frederick City from Ezra Houck. In the latter year, about *one-fourth* of this ground was, by order of the society, laid off into sixty burial lots, of twelve by sixteen feet each, and each of these lots was marked and indicated by four corner posts of white marble, with the respective numbers marked on the stones, which are still there and plainly visible. To each full member who had, at that date, paid up all his dues and fees, one of these burial lots was assigned. A plat was also made of the whole, on which was indicated the individual owner of each lot, according to the allotment and division then made, and lot No. 19 was thus assigned to the plaintiff, who had become a member of the society in 1846 or 1847, and had then paid up his dues in full. In August, 1854, a deed was executed by Houck, in lieu of one which had been previously executed, but which had been mislaid and lost before it was recorded, conveying the whole lot of ground to seven named parties, of whom the plaintiff was one, "and their heirs and assigns forever, *in trust,* that they, the survivors or survivor of them, and the heirs of such survivors or survivor, shall hold said property upon the *trusts* indicated and mentioned in the

Smith *vs.* Thompson.

recital of this indenture." In the reciting part of the deed, after stating that the purchase money of $265 had been paid in full, and that the parties of the second part " now constitute the trustees of said Laboring Sons' Society," it is recited that " said society *has laid off a portion of said ground as a burial ground,* and have desired and directed said trustees to *sell the residue* to the best advantage for the use of said society." All the trustees named as grantees in this deed are now dead except three, Bowen, Probee and the plaintiff. After this allotment and division the plaintiff took such possession of his lot as the purpose to which it was devoted admitted of. In 1858 he buried his aunt there, in 1862 a relative of his wife, in the spring of 1864 his mother, and put up a tombstone for her and had the lot sodded, and in 1878 had this tombstone righted and repaired. It also appears that in 1861 a certificate was issued by order of the society to each of the parties to whom these lots had been so assigned, and the plaintiff received his, which is as follows:

"LABORING SONS' CEMETERY."

This is to certify, that Nicholas Thompson is *the owner* of lot No. 19 in Laboring Sons' Cemetery for which 10 dollars have been paid in full for said lot. In testimony whereof, the president of the trustees has hereunto affixed his hand and seal this 2d day of November in the year 1861.

" *Robert E. Probee.* [Seal.] "

*" Test : Cyrus Bowen."*

About these facts there is no dispute, and if there was nothing else in the case, there can, we think, be little doubt as to the plaintiff's right to maintain this action. The facts thus stated make a case where the trustees who held the legal title and were themselves members of the society, the *cestui que trust,* unite with all the other members, who were fully competent to act, each for himself in

the premises, in setting apart a portion of this ground for burial purposes, and in a voluntary parol partition of that part into separate lots clearly defined and bounded, and in the assignment of these lots severally to individual members, as their respective separate burial places, and this is followed by the separate possession of the individual owners, and the grant of a certificate by the order of the society itself, stating that each member is the owner of the separate place so assigned to him, and for which he had paid the price agreed upon in full. By virtue of these acts and proceedings we think it clear the plaintiff acquired the privilege and right to make interments in this lot, to the *exclusion* of others, so long as the ground remained a burying ground or cemetery, and that for an invasion or disturbance of this right either by a member of the society or any one else he can maintain an action of trespass *quare clausum.* Looking to the peculiar nature of this privilege and knowing how highly it is esteemed, and how sacred it is held by mankind in all civilized communities, we should so decide were the question a new one; but we think the right to maintain the action under such circumstances is sustained by the decision of this Court in *Partridge's Case,* 39 *Md.,* 631, and by the decisions in *Kincaid's Appeal,* 66 *Penn. State Rep.,* 411, and *Meagher vs. Driscoll,* 99 *Mass.,* 281.

The next question is, had the right or privilege thus secured to the plaintiff been forfeited or lost at the time this action was brought? It seems that in consequence of some disagreement among the members, the plaintiff and twenty others, (the whole number of members being forty) in 1862 withdrew and formed another society called "The Workingmen's Society," and thereafter ceased to be members of the old society. The other nineteen members remained in and were subsequently incorporated by the Act of 1867, ch. 343, under the corporate name of "The Beneficial Society of the Laboring Sons of Frederick City." In October, 1863, after some dispute, an equal *pro rata* division

of the money ($655) then in the treasury of the old society
was made among all the forty members, and the amount
coming to the withdrawing members was paid to them or
into the treasury of "The Workingmen's Society," and a
receipt given therefor. It is argued that by this with-
drawal and ceasing longer to be members of the society,
the withdrawing members forfeited and lost all their
interest and rights in these lots. But in our opinion such
was not the necessary consequence of the *mere* act of with-
drawing. It is true, it might have such effect if the parties
intended it should, but it was clearly competent for them
to withdraw and cease to have any interest in the future
income and benefits of the society, and still retain their
rights in the lots which they had secured and paid for at
the time of the division and allotment in 1852. It was
the purpose of the society, as stated in the deed from
Houck, to sell the *residue* of the ground, that is, all save
the portion laid off and allotted to the members in 1852,
to the best advantage for the use of the society, and they
proceeded to sell burial lots in this residue to other parties.
Of course, by withdrawing, these parties would cease to
have any interest in the proceeds of these sales made after
their withdrawal, and all other benefits pertaining to
continuing membership, but it was quite consistent with
this, and so far as we can see, perfectly lawful for them, if
such was their intention, to retain their previously ac-
quired, perfected and vested interests and privileges in
these particular lots. A paper, dated the 6th of October,
1863, was offered in evidence by the defendant, purporting
to be signed by all the withdrawing members, including the
plaintiff, in which they certify that "they have no more
right or title, or interest in the aforesaid society, or interest
in the benefit arising from the graveyard of the said
society." Even if this language could be construed as
manifesting a purpose on the part of the alleged signers
to relinquish or abandon their rights in these lots, the

Court was perfectly right in rejecting the paper, because it was not only never signed by the plaintiff, but his name and the names of all the others, except Probee, were put to it by another party without any authority to do so. The plaintiff testifies not only that he never signed this paper and never authorized any one to sign it for him, but that when the settlement in October, 1863, was made, he never heard it contended that the withdrawing members gave up their lots. He continued afterwards and ever since to assert an exclusive right to this lot. He buried his mother there in 1864, in the same year put up a tombstone, later on had the lot freshly sodded, as late as 1878 had the tombstone repaired, and when his right was invaded for the first time by the defendant, he promptly brought this action. Indeed, it is highly improbable these parties intended, by withdrawing, to revest their exclusive privileges in these lots in the society, and thus give the society the power to *remove the bodies* they had already buried in their lots. But however this may be, no question as to purpose or intent is before us nor was any such question left to the jury. The plaintiff offered no prayer on the question of right or title, and the defendant's prayers rest the defence solely on the *bare facts* of withdrawal, non-membership at the time of the trespass, and the subsequent incorporation of the society by the Act of 1867, ch. 343. In our opinion, neither of these facts of itself or in combination with the others constitutes a bar to this action.

The only prayer of the plaintiff that was granted relates to the question of damages and we find no error in it. It tells the jury they may consider the motive and manner with which the trespass complained of was done by the defendant, and though they may find he was instructed by the society, as their sexton, to bury on the lots of which the plaintiff's was one, they may nevertheless award punitive damages if they find he was not acting in good faith under such instruction, and from an honest belief in the

right and authority of the society so to instruct him, but was in reality actuated by malice or ill-will towards the plaintiff or a wanton disregard or indifference to his rights. There was evidence from which the jury could have found the defendant was actuated by malice in committing this trespass, and it follows the Court was right in rejecting the defendant's fourth prayer, which asserts that the verdict must be for nominal damages only.

What we have thus said disposes of all the rulings in the several exceptions. We find no error in any of them, and the judgment must be affirmed.

*Judgment affirmed.*

(Decided 9th December, 1880.)